Good morning. May it please the Court, Thomas Peterson for the Appellant. The District Court in this case erroneously applied the doctrine of prudential mootness to dismiss several of the counts of this complaint brought by Deutsche Bank in its capacity as trustee on behalf of pension funds and other investors in these mortgage securitization trusts. And I think there are really three key points that I'd like to leave the Court with this morning, if I may. The first is that under FIREA, both its text and under this Court's precedent applying it, when the FDIC steps out of the broad authority that has been conferred upon it under the statute, that it loses some of the benefits that are in the statute, including the claim priority provision in 1821d11, and also the limitation that is imposed on the ability of the courts to grant injunctive and equitable relief under 1821j. The second point I'd like to leave you with is let's look at how there was action in excess of authority. Here what the FDIC did is it took something which is not really an independent asset at all, these so-called mortgage servicing rights, something that neither it nor Indy Bank had any right to independently sell, and it conveyed them to one west, leaving behind the corresponding burdens in those pooling and servicing agreement contracts to cure defective loans. And that was in excess of the authority of the FDIC because this Court has told us in the Sharpe case that the FDIC may repudiate but not breach a contract, and it also violated the provision of the statute, the so-called qualified financial contract provision in 1821e9. And counsel, just as a little refresher for me, just to make sure I'm absolutely clear, when you say they can repudiate but not breach, what's the difference between repudiation and breach? The difference is that when they repudiate, they are essentially declaring the contract at an end. So here the consequence of that would have been that there were ongoing obligations to service these contracts. If they had rejected the contract, that is, said we're not going to go forward with it any much further, those would have reverted back to the trustee, and it would not have been possible for the FDIC to sell them for value. They would have been something that the trustee could have then used for the benefit of the trust holders. I thought they could assign it as long as they had consent. That's correct, Your Honor. That's part of what the violation was here. And, Jan, you say you didn't ask for our consent, right? That's the point. I suppose your consent would be subject to the covenant of good faith and fair dealing? That's – well, I suppose that's right, but I think you have to understand the context in which the pooling and servicing agreement was written. It was written based upon a clear representation to all these investors that one person would hold these responsibilities. But still in all, it does say that they can assign those rights with consent. It doesn't say you can't assign them unless you sign the whole contract, correct? I'm sorry, Your Honor. You're speaking now of the statute or the contract? No, not the contract. Yeah. No, the – The contract does not say you cannot assign these rights unless you assign the whole contract. It says you can assign them if the other people consent, correct? That is, the trustee has to consent, correct? And I assume that the consent has to be within the covenant of good faith and fair dealing. So you couldn't just say, no, I won't you do it. I agree with you as a general proposition, but the covenant obviously wouldn't modify the terms of the contract, and the pooling and servicing agreement contemplates that a single entity would have both these servicing rights and also this cure obligation. So I – This is a separate provision right in the assignment provision of those rights. It's not a general contract that says you can't assign this contract unless you sign the whole. It just says you can assign these rights away if you consent. Your Honor, yes. And I don't want to take up – I don't want to get in a debate with you too much about that unless you want me to, because obviously this was a pleading case. You direct me, obviously, but this is a pleading case, and obviously none of that was explored. And then finally, the third point I want to leave you with is that reversing the judgment in this case, essentially going back to what Judge Fease initially determined, is not going to imperil any policy of firea for the protection of taxpayers or depositors, none of – or priority schemes. None of those interests are implicated in this case. So let me then start with what is it that the statute and the case law requires. And I think here the real focus has to be on this Court's decision in the Sharp case, where the Court made very clear that based upon this statute, that the FDIC has these options which are given to it when it assesses these contracts from an insolvent institution, and it may either enforce, that's E13 of the statute, or it may repudiate, that's E1 of the statute. And Sharp clearly tells us, quote, that firea does not, quote, permit the FDIC to breach contracts at will. And thus, in the Sharp case, the Court held that the administrative exhaustion scheme of the statute was inapplicable because there was no claim in those circumstances. Now, keep in mind that the same term, claim, is the term that becomes relevant for purposes of analyzing the priority provision of Section D20 of the statute. And thus, if there is no claim, this case doesn't fall into that third priority where prudential mootness would be relevant because the FDIC has acted in excess of its power. Now, I recognize that the parties have debated about whether or not this Court has backed off of Sharp, but I think if you look at your precedent, you will find that is not at all what has happened. Look at how this Court has characterized the Sharp case. Take first the McCarthy decision. In the McCarthy decision, this Court said, quote, Our decision in Sharp turned on the claimants being aggrieved parties to a contract that the FDIC had not repudiated. The Counsel, is there any significance to the fact that we noted that the Sharps had fully performed their portion of the contract? No, Your Honor. I think that's just an observation that was made in the McCarthy case about characteristics of Sharp, but not what I would call material characteristics, because, again, look at what McCarthy said the Sharp case, quote, turned on. It turned on the absence of a repudiation. And then look at what the Court said of Sharp in the Batista case, where the Court said, We considered whether parties aggrieved by the FDIC's breach of a contract hold a section 1821d claim that would be the subject of FIREA's exhaustion requirement. Again, we focused on the question of whether or not there was a breach claim available. And then most recently, in the County of Sonoma case that we submitted to you by 28J letter, the Court reiterated that Sharp stands for the proposition that when the FDIC acts outside of its statutory authority, it doesn't get the benefit of the statute, in this case, the restrictions on injunctive remedies under Section J of the statute. So let me then turn to the second dominant point I wanted to leave you with, which is the impact, how it is that the FDIC exceeded its authority in this case. The first thing it did, in the Sharp case, this Court also endorsed the D.C. situation where the FDIC tried to sell an asset out from under a right of first refusal. And this Court held, or the D.C. Circuit in Waterview held, in a decision this Court has endorsed the reasoning of, that the FDIC was not allowed to violate the state law that created the asset. That is, the contract carried with it inherent limitations on what the asset was, that you had to define the asset by reference to those things, and that it was a violation for the FDIC to try to sell without the corresponding right of first refusal. Here, it was a violation to sell without complying with the consent requirement. And again, by creating something that wasn't even an asset at all, it's something which is a part of the overall process of determining whether or not this, how this contract is performed, these servicing obligations. Which brings me, then, to the second type of violation that's here, which is this so-called qualified financial contract provision of the statute, which is 1821E9. And this is the provision that says that the FDIC must sell all of a qualified financial contract. In this case, there were allegations that there was a unitary contract. In this case, what the district court concluded in this case was he thought that these pooling and servicing agreements really are two agreements. One involving the sale of loans with these cure obligations as to non-conforming loans, and the second involving servicing rights. I think the simplest way to deal with this issue is to recognize that this is a pleading case. You had a pleading where, on the face of the pleading, it is alleged that this was a unitary contract. Counsel, just, again, just to make sure I've got my terms clear. Your argument is that the FDIC has breached the contract, and that its only option was either to enforce the contract or to repudiate it. Yes, yes. Well, I guess I would qualify that slightly, Your Honor, if they wanted to stay within FIREA's scheme. When they breach, and then they fall out of the scheme, so they don't get the benefit of it anymore. If the FDIC had been following the procedures that you think it had to follow, what would FDIC, FDIC had to have done here in order to repudiate? The FDIC would have had to give us a notice of repudiation of the contract, whereupon we would have had the opportunity to get back these servicing rights, which they instead turned around and sold without conveying the corresponding obligation to cure the non-conforming loans in violation of the consent provisions, which was the claim that Judge Feist found was alive and well. And also, in violation of these QFCA qualified financial contract requirements of the statute, which say that you can't split these things, you can't split them apart, you can't, you have to sell all the rights to one person. And there, I think, the error that the Court made was that what, that at a minimum, you'd have to do a severance analysis to determine whether or not it was proper to sever the contract. The district court didn't do that. I think that's a fact question. Here, the contracts are governed by New York law, and there's a whole series of sort of fact-based inquiries that you'd have to look at, which is whether, whether separate parties are involved. That would favor severance. Here, we have the same parties. Whether we have mutually dependent agreements. Here, we have one agreement that, that has these interactive provisions. And whether or not the obligations cross-reference one another. And we point out that's true. And then finally, the Court also erred in that part of its analysis, because even if you were to tie, to pull these provisions apart, the servicing obligation still meets the definition of a qualified financial contract, because that definition simply says you have to have an interest in the loan. And the servicer has an interest in various respects. It gets paid out of revenue of the loan and the like. So I'm, no, I'm running out of time here. I want to just cover my third point, so I'm not guilty of false advertising at the outset. With respect to the purposes of FIREA, if, if, if you go, agree with what Judge Feist originally thought, then, then I think, first, you're, you're not affecting the taxpayers. The, the taxpayer, the FDIC is self-financed out of bank insurance premiums. They're paid on deposits. You're not, you're not benefiting Deutsche Bank. This is, this case is on behalf of the, the beneficiaries of the trust. You're, you're not disrupting the priority scheme, because the priority scheme contemplates that the FDIC is not going to sell something it has no right to in the first place. So you can't say that you were enhancing the priority scheme by putting something into the pool that doesn't belong there. And, and, and so, so therefore, I think, I, I see my yellow light is on, and I, I urge the Court that this case merits reversal, and I'll reserve the balance of my time. But I, I'll give you a minute for it, but if I did have a question about your reliance on Sharpe vis-à-vis the priority scheme, because Sharpe really did not address the priority scheme. Your, Your Honor, you're right. The Sharpe case is actually applying to the administrative exhaustion scheme. FIREA requires generally that to come to court, you have to exhaust your claim. We did that here, by the way. But, but, but the key, the key thing, though, in Sharpe is, Sharpe holds that there is no claim within the meaning of FIREA if, if, if the FDIC is not acting in, in accord with its authority. If you look, then, at the priority scheme, which is in D11 of the statute, it talks about the order in which a claim will be paid. So, and in fact, Batiste, so, so what Sharpe did, I think, is it, it defined claim, and you've got to give that term, I think, the same definition throughout FIREA, and certainly in the same subpart D section that the Court was talking about in Sharpe. Yeah, but we've recognized that Sharpe was a very limited case, and in actuality, you're asking us to extend Sharpe further. No, well, no, Your Honor. I, I, I, I, I recognize that in McCarthy, you said that Sharpe was an unusual case, and factually, perhaps it was. This, I, I would suggest, is an unusual case, too. If you're selling an asset, you have no right to, but, but, again, look at what McCarthy said Sharpe turned on. It turned on the lack of repudiation. Look at what Batiste said Sharpe was about. It's about the, the FDIC's unauthorized breach of a contract. I think this Court has not placed the kinds of limits on, on Sharpe that my, my adversary Even if one assumes that there was a breach of contract, why wouldn't that still put the claim into the priority hierarchy that's been articulated in the statute? Because the statute represents a comprehensive authorization of what the FDIC is, is, is authorized to do in its receivership capacity, and you won't find that it's authorized to breach. I, I, I take that back. You, you will, in a narrow specific circumstance different from the one here, if you look at D-20 of the statute, you'll find that it says that if the FDIC first approves a contract, then it may breach, but then you have a claim one level priority. So the absence of the statute addressing the breach scenario is a byproduct of the fact that Congress didn't include that within its authority. All right. Thank you, counsel. We'll give you a minute for rebuttal. Thank you very much. Thank you, and may it please the Court, I'm Scott Watson here today on behalf of the FDIC as the receiver for IndyMac Bank and the receiver for IndyMac Bank Federal. I'll plainly be addressing the Sharpe decision in a moment, but I'd like to turn to the question that you posed, and that's whether the Deutsche Bank is seeking an extension of the Sharpe case beyond anything Sharpe envisioned, and it plainly is. Sharpe never addresses the distribution scheme, never addresses the consequence of breach, rather Sharpe only addresses whether, and the Batista case, which they argue gives a broad reading to the Sharpe case, we think is a limitation, because it recognizes that all Sharpe addressed is whether it would be considered a claim for the exhaustion requirement under the claims process, and the Sharpe decision focused on the absence of any creditor relationship, and the express holding in the Sharpe decision is because the Sharpes are not creditors, they're not subject to the exhaustion requirement. The Court never got to the distribution scheme or the other consequences, and what this shadow distribution scheme that Deutsche Bank argues for is a plain rejection of the plain language of the statute, and the revision that they asked this Court to make to plain language of the statute, which says any general liability will be paid after depositors. If this Court were to make the revision that they suggest to the statute, it would undermine or defeat the purposes of that statute, which I'll be addressing, and this Court has already rejected an argument that Congress intended a distribution scheme outside D11, and that was in the Batista case. It said if Congress had intended for there to be a different distribution scheme, we certainly would expect it to mention it somewhere, and that having established these hierarchies, that there to be applied, and we borrowed the Supreme Court's colorful analogy, that Congress doesn't hide elephants in mouse holes. Congress said here that there's a distribution scheme, and that any general liability was going to be paid after depositors. They're asking instead for this Court to rewrite that statute to say only those contracts that are repudiated will be paid in that priority. Other contracts must be paid above any other party, and the statute simply doesn't support that, nor does the Sharpe decision. As I said, the wording is the Sharpe support anything, the way you're describing Sharpe in a way? Well, this Court has already... They didn't have to exhaust, perhaps, but then, let's see, that was a case where FDIC did something that looks a little bit shady on its face, but anyway, so it doesn't pay them. It records a document that they wasn't supposed to record until it paid them, but it didn't pay them either. So as you see where Sharpe comes out in the long run, where and when were they going to get their money? Well, the Court recognized that they had already received some of their money through the FDIC's distribution. I understand, and one of those shits of some kind. If I can, you asked what we believe that the Sharpe decision does hold in support, and that's the very limited proposition, and it's actually the one reflected in the McCarthy decision, and that is that because the exhaustion requirement envisions sending out notices of claims to creditors, and because there was never an intention on the part of the Sharpes ever to be a creditor of that failed bank, they envisioned a simultaneous exchange. They weren't having a creditor relationship at all. The simultaneous exchange didn't take place, and they received a cashier's check, which in the general operation of things makes them a creditor of the bank. It makes them a depositor. Cashier's check makes one a depositor, and the FDIC argued that being depositors, they were creditors and therefore fell under the scheme. All the Court said was, no, they're not creditors. They didn't envision a creditor relationship, and McCarthy identified that there was a simultaneous exchange that was contemplated. So that was the limit of the decision in Sharpe as to why the claim did not fall under the exhaustion requirement. I understand that, but you said the fact it doesn't fall under exhaustion doesn't mean it falls under something else. It doesn't mean that they're not subject to the regular distribution scheme. Would that be your position on Sharpe? They were subject to the regular distribution scheme. It is, Your Honor. That's correct. And, in fact, the Court did the Court had an opportunity at least to opine or speak to the distribution scheme and made no comment. It merely remanded. It said they've already received some cash and a distribution on a receivership certificate. We will remand to the district court to make further determinations whether they're owed more. But that's all that was decided in Sharpe, and the Court didn't make a comment about the distribution scheme at all. Ergo, if they had been dealing with NDMAT, the your answer would be, ergo, it their case is moot because they're not going to get any distribution at all. Is that correct? Sharpe? In the well, would that be true? As general creditors, which the Court rejected because there was no no creditor relationship envisioned by the partners, had they been general creditors, it is our position if they'd been general creditors of NDMAT, their claims would be moot. They have claims. But since they weren't. Since they weren't creditors, in that case, because of the unique circumstances of the simultaneous exchange, they were not creditors for purposes of the exhaustion requirements, certainly. So they fell elsewhere in the priority scheme, right, in the hierarchy of payment? Actually, the Court didn't go that far. It didn't examine the priority scheme. All it said is, we're not going to find that the district court properly dismissed the case for lack of subject matter jurisdiction for failing to exhaust because under those unique circumstances, there was no exhaustion requirement, that that did not fall under the exhaustion requirement in FIREA. But my question to you is, like, you know, come into a little different cosmos. And my question to you is, where would you put them, given the Sharpe decision, what happens to the Sharpes, in your view? The Sharpes would have been paid as creditors from the receivership estate of the failed bank. In that case, they may have been paid distributions if there was anything to pay to creditors of the institution. But I thought Sharpe said they were not creditors. Sharpe did say they're not creditors. But if they're not creditors, and we had to decide how they would be paid, in the statutory scheme, where would they fall? If they're not creditors, then what mechanism, excuse me, would be used to pay them? And under the statute? We think under the statute, it still would have been a general liability. That the Court, focusing on creditor, found the exhaustion requirement didn't apply, but it still would have been a general liability. But let's contrast the Sharpe decision. So they'd be in the same moot category if there was no money for beyond depositors. Is that correct? Had it been in the Indiamac receivership. They would not be administrative. They would be. That's correct, Your Honor. The administrative expense priority envisions, as the D.C. Circuit just announced in the recent MBIA decision, it envisions a formal written execution or approval of a contract in order to elevate breaches to administrative expense status. I'd like to contrast, though. Indiamac, or excuse me, Deutsche Bank, plainly had a creditor relationship with Indiamac. It was always envisioning being a creditor, where it didn't demand immediate performance, but it gave credit for future performance of the contract and an ongoing performance between the parties. And it's undisputed, and really can't be disputed, that they were creditors. Certainly, there's no simultaneous exchange, as the chart panel confronted. And being creditors, there just isn't anything in the statute's language to support a distinction between them and any other creditor of the failed institution. When Congress used the word any, it meant any. Any general secured liability. Excuse me, any general unsecured liability. And in that very same statute, Congress demonstrated that it understood that there was an exception, and that was for secured creditor liabilities. And those fell outside the scheme. It's in the preamble there in D11. So Congress recognized at one point in D11, the distribution scheme, that there was an exception for secured interests, but made no such exception in using the term liability. We suggest that that doesn't allow for the exception that Deutsche Bank suggests here. And it shouldn't be rewritten by this court to mean most or some or breaches of repudiated contracts. The Gonzales case that we cited explains that this court should be bound by Congress's use of the word any. And Congress in, excuse me, this court in Batista did exactly that. It found that Congress had established this depositor preference scheme, had placed general unsecured liabilities in that third tier, and found there was nothing in the statute that could suggest or support a separate distribution scheme. In that case, it was for repudiated contracts. But what they said was, what this court said in that opinion, is that Congress would have reflected if there were a different scheme or if it intended something else in the statute. And here, what they're asking for is an implicit distribution scheme entirely outside the statute that isn't mentioned or supported anywhere in the statute. And during Deutsche Bank's argument, they suggested that the policy considerations are not, are not implicated in this case. And we have to disagree most strongly. The policies, the first policy that's implicated is a principle one, and it was relied on by the district court below. And that's depositor preference. The FDIC's role and the statute's very purpose is to maintain the public's confidence in the integrity of the banking system. And it does it through deposit insurance. And it has done it by establishing a depositor preference scheme. It says, depositors are going to be paid and satisfied first before any creditors of that failed bank are going to be satisfied. And this court shouldn't substitute its judgment as to how another scheme might work when Congress has said, no, we want to ensure that depositors are satisfied. That has the benefit of instilling additional confidence on the part of depositors in the system. To elevate these claims that are claims against the failed bank, arising from a contract with the failed bank above depositors would undermine that. The statute has also been recognized as being intended to enhance the resolution authority of the FDIC and eliminate impediments to that authority. This would have an undermining effect as well if the court departs from D11. And the efficient resolution that's talked about there, the FDIC is the receiver for hundreds of banks with thousands of contracts. And the binary rule that Deutsche Bank suggests, repudiate or achievable by the FDIC in forcing it to make a line by line determination of every contract in order to determine whether to repudiate every contract. Or honor it by paying cash. And the DC circuit reflected, excuse me, commented on the absence of anything in the statute that creates that binary obligation. The repudiation obligation, Congress described as an additional right, in addition to those the FDIC already had as receiver. And it said that it had the right to repudiate and attached only one consequence. And that is, if the FDIC did repudiate, it has the effect of limiting damages, to direct compensatory damages. And if it fails to repudiate, as the District of Columbia Circuit found, the only consequence is FDIC is not entitled to take advantage of that limitation on damages. But it doesn't create a binary scheme where the failure to repudiate elevates a breach of contract above all other breaches of contract and above depositors and above administrative expenses. In fact, if we posited that IndyMac had had a buyer for the failed IndyMac, when the FDIC took over, a buyer had been there immediately. The FDIC presumably would have done a purchase and assumption agreement, which is a preferred method of resolving failed institutions. Again, looking at the policies, it is done overnight, but it has the benefit of having continuous uninterrupted banking service for all depositors and for everyone doing business with the bank. The purchase and assumption agreement here, they would have required that the FDIC step in overnight and make determinations whether to repudiate or not repudiate any given contract. And to ask the FDIC to do so or to force it to pay in cash would undermine the purposes of the statute as well as deviating from the plain language. Thank you, Your Honor. Thank you, Counsel. Mr. Buttock. Thank you, Your Honor. Let me start with Judge Fernandez's question. What would have happened to the Sharps under the claims statute? I'm sorry, under the priority statute. They didn't have a claim, so they weren't subject to it. And, in fact, if you look at what the Court says in Roman V of the Sharp decision, it says, we conclude that the FDIC breached the contract in question. We reverse and remand to determine the remedy available. There was no suggestion that there was going to be any sort of claim structure to be employed or priority structure. Let me turn to the second point that my friend made, which is this issue about whether or not the creditor status. You are a creditor as to a claim. It is a claim that becomes relevant for purposes of the priority scheme. If you look at D11, it talks about a distribution, quote, to pay claims. With respect to his point about general liability of the institution, it is general liability as to claims, which is what Sharp is all about. The Batista case did not suggest that you could, that everything has to channel through the FIREA priority scheme because it laid Sharp to one side. It simply said that if you honor your repudiation obligation, then you're subject to that scheme. This has nothing to do with depositors. Even if there is not enough money in the fund to pay depositors, that is what the insurance scheme is for. That is a separate pool of resources. And finally, let me address this point about efficiency. The FDIC did not have to immediately pay the claim in cash. The FDIC could have tried to sell the servicing rights along with all the other contractual obligations, which was what was originally intended, or it should have sought our consent for that, in which case it may very well have gotten it. So looking at all these considerations, this Court's precedent  and send this pleading case back for further proceedings. Thank you very much. Thank you, counsel. Thank you to both counsel. The case is submitted for decision by the Court.
judges: Fernandez, Rawlinson, Bybee